**THE HUNTINGTON NATIONAL BANK, Appellee,**

v.

**GLOBAL PUBLISHING PAPERS, INC., Eagle Paper, Inc. and James R. Wheeler,**

v.

**Standardbred Horse Sales Company, Northwood Bloodstock Agency and Gary Cameron and USAccess Bank, Inc. and Northwood Bloodstock Agency.**

**Appeal of USAccess Bank, Inc.**

Superior Court of Pennsylvania.

Argued April 15, 2004.

Filed June 22, 2004.

Steven J. Adams, Reading, for appellant.

Jayson R. Wolfgang, Harrisburg, for Huntington, appellee.

Before: BENDER, McCAFFERY and TAMILIA, JJ.

OPINION BY TAMILIA J.:

¶ 1 USAccess Bank, Inc. (UAB) appeals the May 20, 2003 Order, amended June 13, 2003, denying its motion for summary judgment against The Huntington National Bank (Huntington) and Northwood Bloodstock Agency (Northwood), *inter alia*, and granting, in part, Huntington's cross-motion for summary judgment.[1] After careful review, we reverse the Order and remand for further proceedings consistent with this Opinion.

¶ 2 This case is one of first impression arising under Revised Article 9 of the Pennsylvania Uniform Commercial Code[2] (UCC) and involves the determination of whether UAB or Huntington holds a superior interest in assets of a common debtor, James R. Wheeler (Wheeler). Revised Article 9 became effective in forty-six jurisdictions and the District of Columbia on July 1, 2001.[3] At the heart of our inquiry is the type of "horrendous complications" that arise in a multi-state dispute where the forum state has enacted Revised Article 9 but the state of perfection has not. 13 Pa.C.S.A. § 9701, Official Comment.

¶ 3 On February 9, 2001, UAB made a loan to Wheeler in the amount of $1,700,000. To secure repayment of the loan, Wheeler granted UAB a lien and security interest in all the horses he owned or thereafter acquired. Pursuant to the UAB security agreement, Wheeler also agreed to assign and transfer to UAB the United States Trotting Association (USTA) registration certificates for the horses. That same month, UAB filed financing statements with the appropriate offices in Florida, Kentucky, Ohio, and New Jersey to perfect its interest. Wheeler was a resident of Florida at the time.

¶ 4 By June 2001, Wheeler defaulted on the UAB loan, and entered into a loan modification agreement with UAB. In connection with the agreement, Wheeler obtained UAB's consent to sell the horses subject to UAB's security interest at a week-long auction conducted by the Standardbred Horse Sales Company (Standardbred). Wheeler subsequently entered into a consignment contract with Northwood for the sale of twenty-one of his

---

1. Huntington's motion for summary judgment was granted against intervenor USAccess Bank (UAB), garnishees Standardbred, Northwood, and Gary Cameron, and defendants Global Publishing Papers, Inc., Eagle Paper, Inc. and James R. Wheeler, but was denied with respect to Northwood. Trial Court Order, 5/20/03.

2. As UAB correctly notes in its brief, the Pennsylvania legislature has designated its version of Revised Article 9 as "Revised Division 9." For simplicity, we chose to use the more familiar term Revised Article 9 throughout this Opinion.

3. Revised Article 9 did not go into effect on July 1, 2001 in Connecticut, Alabama, Florida, and Mississippi. Revised Article 9 has since become effective in Connecticut, on October 1, 2001, and Alabama, Florida, and Mississippi, on January 1, 2002.

horses, and notified Northwood to deliver all the proceeds from the sale to UAB. Northwood, in turn, entered into a consignment contract with Standardbred, and arranged for the consigned horses to be registered for sale at the auction.

¶ 5 Prior to the Standardbred auction, Huntington recovered a judgment against Wheeler in Franklin County, Ohio, after Wheeler defaulted on loans Huntington made to him. On October 22, 2001, Huntington registered its judgment against Wheeler in Dauphin and Adams Counties, Pennsylvania.

¶ 6 Standardbred conducted its annual auction at the Pennsylvania Farm Show Complex in Harrisburg between November 4, 2001 and November 10, 2001. During this period, UAB notified Standardbred that it held a security interest in the twenty-one consigned horses and instructed Standardbred to forward the proceeds generated from their sale directly to UAB. In addition to selling the twenty-one horses, Wheeler purchased five horses[4] at the auction for approximately $256,275.

¶ 7 On November 10, 2001, Standardbred completed the sale of nineteen of the consigned horses with full knowledge of UAB's security interest.[5] The sale generated gross proceeds totaling $278,500. That same day, Huntington had a writ of execution served on Standardbred and Northwood, as garnishees, in Dauphin County, Pennsylvania. The writ of execution attached to the proceeds from the sale of the consigned horses, as well as any of Wheeler's property in the possession of Standardbred or Northwood during this time.

¶ 8 At the time of execution of this writ, Revised Article 9 was effective in Pennsylvania but not in Florida. No financing statement was ever filed by UAB in Pennsylvania prior to the execution of this writ.

¶ 9 On November 30, 2001, Standardbred informed Huntington it was in possession of the sale proceeds from the consigned horses and five UTSA registration certificates reflecting ownership of the newly purchased horses. Standardbred claimed a legal interest in the purchased horses and related registration certificates as a result of Wheeler's failure to pay the purchase price, and argued it was owed commissions from the sale of the consigned horses. Northwood also contended it was entitled to commissions earned on the sale of the consigned horses, as well as attorney's fees and costs in connection with the November 10, 2001 attachment proceeding.

¶ 10 Between January 2, 2002 and January 18, 2002, Wheeler paid Standardbred approximately $263,291.69 for his five new horses. During this time, three of the five horses were in the possession of the Gary Cameron Stables (Cameron) for boarding. On January 4, 2002, Standardbred and Huntington reached an agreement whereby Standardbred was paid a $60,000 commission and agreed to deposit the remaining proceeds from the sale of the consigned horses with the Dauphin County Prothonotary. That same day, Huntington filed a motion to release the contested sale proceeds, and the court issued an Order directing that the funds be distributed to Huntington if no objection was filed within ten (10) days. Seven days later, on January 11, 2002, UAB and Northwood each filed objections to the Order.

---

**4.** The purchased horses are identified as Cinch Hanover, Jated Love, Dave's Design, Fancy Creek Photo and Penn Pronto.

**5.** Three of the consigned horses were withdrawn from the auction prior to the sale.

¶ 11 On January 16, 2002, Huntington had a writ of execution served upon Cameron, as garnishee, in Adams County, Pennsylvania. The writ of execution attached to five of Wheeler's horses in Cameron's possession, three of which were purchased by Wheeler at the November 2001 auction.[6]

¶ 12 On April 3, 2002, following the resolution of several jurisdictional and procedural issues, the trial court entered an Order consolidating the Dauphin and Adams Counties actions and granting UAB and Northwood status as intervenors. The parties agreed that the Dauphin County Court of Common Pleas would decide which party was entitled to the contested sale proceeds, the five newly purchased horses and their USTA registration certificates, and the Adams County horses. On May 28, 2002, UAB moved for summary judgment against Huntington, Wheeler, and Northwood. Huntington filed a cross-motion for summary judgment on June 24, 2002 against Standardbred, UAB, Northwood, Cameron, and Wheeler.[7] On May 20, 2003, the court granted Huntington's cross-motion for summary judgment, and denied UAB's motion for summary judgment against Huntington, Wheeler, and Northwood in its entirety. This appeal followed.

¶ 13 UAB raises six issues for our review:

A. DID THE TRIAL COURT ERR AS A MATTER OF LAW IN DETERMINING AND APPLYING THE PROPER LAW TO THIS CASE UNDER PENNSYLVANIA'S REVISED ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE?

B. DID THE TRIAL COURT ERR AS A MATTER OF LAW IN CONCLUDING THAT HUNTINGTON IS A LIEN CREDITOR WITH RESPECT TO THE GROSS SALE PROCEEDS AND THE REGISTRATION CERTIFICATES?

C. DID THE TRIAL COURT ERR AS A MATTER OF LAW IN CONCLUDING THAT UAB WAS REQUIRED TO FILE A UCC–1 FINANCING STATEMENT IN PENNSYLVANIA TO PERFECT ITS SECURITY INTEREST IN THE CONSIGNED HORSES, THE GROSS SALE PROCEEDS, THE REGISTRATION CERTIFICATES, THE PURCHASED HORSES AND THE ADAMS COUNTY HORSES AFTER REVISED ARTICLE 9 BECAME EFFECTIVE IN PENNSYLVANIA?

D. DID THE TRIAL COURT ERR AS A MATTER OF LAW IN CONCLUDING THAT HUNTINGTON HAS A SUPERIOR LIEN ON THE GROSS SALE PROCEEDS, THE REGISTRATION CERTIFICATES, THREE OF THE PURCHASED HORSES AND THE ADAMS COUNTY HORSES?

E. DID THE TRIAL COURT ERR AS A MATTER OF LAW IN CONCLUDING THAT A GENUINE

---

6. The horses owned by Wheeler and in possession of Cameron during this period were Speedy Link, Real Fancy, Dave's Design, Fancy Creek Photo, and Penn Pronto, the latter three having been purchased at the November 4, 2001 sale. Speedy Link and Real Fancy are hereafter designated as the Adams County horses.

7. On August 23, 2002, the court approved a settlement agreement between UAB, Huntington, and Northwood that resolved all of the outstanding claims involving Standardbred and authorized Standardbred to deposit the USTA registration certificates for the five newly purchased horses with the Dauphin County Prothonotary's Office.

ISSUE OF MATERIAL FACT PRECLUDED THE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF UAB AGAINST NORTHWOOD?

F. SHOULD THE DECISION OF THE TRIAL COURT BE REVERSED AND SHOULD THE TRIAL COURT BE INSTRUCTED TO ENTER JUDGMENT IN FAVOR OF UAB?

Appellant's brief at 4.

¶ 14 Our standard of review in determining whether a trial court erred in granting a motion for summary judgment is well-settled.

> Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions and affidavits and other materials demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We apply the same standard of review as the trial court in that we view the record in the light most favorable to the party opposing the motion and resolve all doubts as to the existence of a genuine issue of material fact in favor of the nonmoving party.

*Philadelphia Ambulatory Care Center, Inc. v. Rite Aid Corp.*, 805 A.2d 613, 614 (Pa.Super.2002) (citations and quotations omitted).

¶ 15 Proper appellate review dictates we overturn an Order granting summary judgment where the trial court has "committed an error of law or abused its discretion." *Wilson v. A.P. Green Industries, Inc.*, 807 A.2d 922, 924 (Pa.Super.2002) (citation omitted). As with all questions of law, our review of a court's grant of summary judgment is plenary. *Phillips v. A-Best Products Co.*, 542 Pa. 124, 665 A.2d 1167 (1995).

¶ 16 The threshold issue in this case is whether UAB's security interest, filed in Florida on February 9, 2001, was perfected in Pennsylvania at the time Huntington's first writ of execution was served. Generally, Revised Article 9 continues former Article 9's long-standing rule that the first secured party to file a financing statement or to perfect its security interest has priority. 13 Pa.C.S.A. § 9322(a)(1). Resolution of this issue is dependant on our determination of what jurisdiction's substantive law should be applied in a multistate dispute where Revised Article 9 was not in effect in both jurisdictions at the time the cause of action arose. UAB first argues "the Trial Court erred, in part, in determining the proper law to apply to the issues to be decided in this action under Pennsylvania's Revised Article 9 and it erred in applying that law." Appellant's brief at 21.

¶ 17 The trial court concluded Florida law governs the parties rights under the UCC and Pennsylvania law applied to every other aspect of this case.

> The present action was commenced on November 10, 2001. As evinced by the dates of the effective revisions to Article 9 of each of the concerned states, this action was commenced before revised Article 9 was implemented in Florida but after revised Article 9 was in effect in Pennsylvania. Therefore, if Pennsylvania Article 9 (Revised) is in effect, Florida law governs this case regarding the perfection or non-perfection of USAccess's security interest because, as Revised Article 9 of the Pennsylvania Uniformed Commercial Code states:
>
> § 9301. Law governing perfection and priority of security interests
>
> (A) GENERAL RULE; LOCATION OF DEBTOR.—Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the

local law of that jurisdiction governs perfection, the effect of perfection or nonperfection and the priority of a security interest in collateral.

(B) POSSESSORY SECURITY INTERESTS; LOCATION OF COLLATERAL.—While collateral is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection and the priority of a possessory security interest in that collateral.

Correspondingly, under the facts of this case, including the loan made by USAccess to Wheeler, Wheeler's subsequent default on the loan, Huntington's Writ issued and served on Standardbred at the commencement of the horse auction that took place in Dauphin County, Pennsylvania, the auction itself, and by the time USAccess intervened, Florida law controlled because all of the events cited took place before the effective date of the Article 9 revision in Florida. Therefore, under either scenario mentioned, Florida law applies and not just any law but "old" Article 9 under Florida law.

Trial Court Opinion, Cherry, J., 5/20/03, at 8–9 (citations omitted).

¶ 18 UAB avers Florida law does not apply to the entire analysis of the parties' rights under the UCC and the trial court should have applied only the substantive laws of Florida's former Article 9 and not Florida's choice of law rules. Appellant's brief at 28; reply brief at 3. In reaching this decision, UAB relies heavily on the Official Comments to Revised Article 9 and a report prepared by its drafters.

*See PEB (Permanent Editorial Board) Report: Article 9 Perfection Choice of Law Analysis Where Revised Article 9 is Not in Effect in All States by July 1, 2001,* The Business Lawyer, Vol. 56, August 2001 (PEB Report).[8] Following a thorough and meticulous review of the evidentiary record, the parties' arguments, and the Official Comments to Revised Article 9, we agree with UAB's contentions.[9]

¶ 19 It is undisputed that the present action arose in Pennsylvania sometime between October 22, 2001 and November 10, 2001 when Huntington registered its judgment against Wheeler in Pennsylvania and had a writ of execution served on Standardbred and Northwood. It is also undisputed that at the time this cause of action arose, Revised Article 9 was in full effect in Pennsylvania, but not in Florida. 13 Pa.C.S.A. § 9701. Recognizing the transition from former Article 9 to Revised Article 9 "gives rise to difficult problems and uncertainties," the drafters of Revised Article 9 implemented certain transition rules to help alleviate any complications that would arise in multi-state disputes. 13 Pa.C.S.A. § 9701, Official Comment. As the forum state for this controversy, the trial court sitting in Pennsylvania was required to utilize the transition rules of Revised Article 9 to determine which jurisdiction's substantive law should be applied in a multi-state dispute.

¶ 20 The transition rules of Pennsylvania's Revised Article 9 are found in §§ 9701 thru 9710. Revised § 9702 contains the transition rule governing security interests or liens created before the effec-

---

8. While limited in scope, we note the PEB Report provided this Court with valuable insight and guidance in resolving the issues presented in this case.

9. Although the issues raised in UAB's brief, in large part, meld "perfection" with the "effect of perfection or nonperfection," the foregoing analysis addresses only the court's misapplication of the law with regard to the question of perfection.

tive date. In pertinent part, § 9702 provides:

(a) **Pre-effective-date transactions or liens.**—Except as otherwise provided in this chapter, *Revised Division 9 applies to a transaction or lien within its scope even if the transaction or lien was entered into or created before the effective date* of Revised Division 9.

. . . . .

(c) **Pre-effective-date proceedings.**— Revised Division 9 does not affect an action, case or proceeding commenced before the effective date of Revised Division 9.

13 Pa.C.S.A. § 9702, **Savings clause,** (a), (c) (emphasis added). In situations involving conflicting claims to collateral, priority is governed by Revised § 9709(a).

(a) **Law governing priority.**—*Revised Division 9 determines the priority of conflicting claims to collateral.* However, if the relative priorities of the claims were established before Revised Division 9 takes effect, Former Division 9 determines priority.

13 Pa.C.S.A. § 9709, **Priority,** (a) (emphasis added).

¶ 21 Here, UAB's security interest in the five horses purchased at the auction, their USTA registration certificates, the Adams County horses and the contested sale proceeds was created in Florida on February 9, 2001, almost six months prior to Revised Article 9's uniform effective date. Moreover, the priorities of the parties were not established until Huntington registered its judgment against Wheeler

and commenced this action in November 2001. Accordingly, Pennsylvania's Revised Article 9 governs the issues of perfection presented in this case.

¶ 22 The trial court recognized this much in citing Pennsylvania Revised § 9301 as a possible "scenario" that would lead to the applicability of Florida's former Article 9. *See* Trial Court Opinion at 8–9, *discussed supra.* Ultimately, however, the court chose to proceed only under the then-applicable Florida law (former Article 9). In doing so, the court erred in applying former Article 9's choice of law rules in addition to its substantive perfection rules. *See Id.,* at 11–14.

¶ 23 Revised §§ 9301 through 9307 provide the choice of law rules for determining the state whose substantive law governs whether a security interest has been perfected (perfection state). For the purposes of determining whether a security interest has been perfected, the general rule is that the local law of the jurisdiction where the debtor is located governs.

(a) **General rule; location of debtor.**—Except as otherwise provided in this section, *while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection,* the effect of perfection or nonperfection and the priority of a security interest in collateral.

. . . . .

13 Pa.C.S.A. § 9301, **Law governing perfection and priority of security interests,** (a) (emphasis added).[10]

---

10. This general rule is subject to several exceptions, none of which is applicable to this case. The most notable of these exceptions is a possessory security interest, addressed in Revised § 9301(b). A possessory security interest is one that the secured party has perfected by taking possession of the collateral. 13 Pa.C.S.A. § 9301, Official Comment, 5.

Revised § 9301(b) provides that the local law of the jurisdiction where the collateral is located governs the perfection of a possessory security interest in that collateral. 13 Pa. C.S.A. § 9301(b), **Possessory security interests; location of collateral.** Here, UAB did not take possession of the purchased or Adams County horses, USTA related registra-

¶ 24 A debtor who is an individual is located in the state in which the debtor principally resides. 13 Pa.C.S.A. § 9307(b)(1). When a debtor changes his location, i.e. changes his principal residence, the jurisdiction whose law governs perfection under § 9301(a) changes as well. 13 Pa.C.S.A. § 9301, Official Comment, 6. Here, it is undisputed Wheeler was a resident of Florida at the time UAB filed a financing statement in February 2001. Moreover, no evidence was presented to establish Wheeler no longer resided in Florida at the time this action was commenced. Accordingly, the choice of law rules of Pennsylvania's Revised Article 9 directs a trial court to apply the substantive local laws of the perfection state to determine whether UAB's security interest was perfected. The Official Comment to § 9301 further clarifies this rule by directing a forum state that has adopted Revised Article 9 to "apply *only* the substantive ("local") law of a particular jurisdiction *and not its choice of law rules*." 13 Pa.C.S.A. § 9301, Official Comment, 3 (emphasis added); *see also PEB Report* at 1735–1736.

¶ 25 As discussed, Revised Article 9 did not go into effect in Florida until January 1, 2002, well after UAB filed its financing statement in Florida and Huntington commenced its cause of action against Wheeler. Under the substantive "local" law of Florida at that time (former Article 9), the security interest in question was properly perfected when UAB filed a financing statement with the Florida Secretary of State. *See* F.S.A. § 679.303(1); F.S.A. § 679.203(1); F.S.A. § 679.401(1)(a) and (c). The choice of law rules of then-applicable Florida law required the trial court to follow Pennsylvania's filing rules at that time. *See* F.S.A. § 679.103(1)(b) (1998); F.S.A. § 679.103(b) (2000). The choice of law rules under Florida's former Article 9, however, are not applicable. Accordingly, the court's conclusion that UAB was "required to file a financing statement with the Pennsylvania Secretary of State in order to perfect its security interest in the horses" is in error. Trial Court Opinion, at 13–14. UAB's February 9, 2001 filing subsequently perfected its security interest in every jurisdiction the goods were located, including the forum state, Pennsylvania. Accordingly, Huntington's rights, as established by execution of its November 2001 writ, are secondary and subordinate to UAB's rights. Based on the foregoing conclusion, we deem the remaining issues raised by UAB with respect to Huntington moot.

¶ 26 We now turn to UAB's claim against Northwood.[11] UAB argues "the trial court erred as a matter of law in denying UAB's motion for summary judgment against Northwood." Appellant's brief at 57. At trial Northwood claimed: (1) Wheeler was an agent of UAB when he executed the consignment contract with Northwood, and (2) UAB was therefore contractually liable for the attorney's fees and costs Northwood incurred in defending the attachment proceeding since their recovery was provided for in the contract. Trial Court Opinion at 15. The trial court denied UAB's motion for summary judg-

---

tion certificates, or the contested sale proceeds.

Other exceptions include: § 9301(c)(1) (security interests perfected by a fixture filing); § 9301(c)(2) (security interests in timber to be cut); § 9301(d) (security interests in as extracted collateral); § 9301(e)(1) (security interests in goods covered by certificate of title); § 9301(e)(2) (security interests in deposit accounts); § 9301(e)(3) (security interests in investments property); and § 9301(e)(4) (security interests in letter-of-credit rights).

**11.** Appellee Northwood did not file a brief in response to UAB's claims.

ment against Northwood on the grounds "genuine issues of material fact exist concerning the existence of an agency relationship between [UAB] and Northwood." *Id.* at 16. The court further concluded Northwood was "entitled to recover its fees and costs from the funds gathered at the sale of the horses at the auction." *Id.*

■ ¶ 27 UAB acknowledges Northwood is entitled to recover $14,951 in commissions out of the sale proceeds, but maintains Article 9 expressly rejects the theory of liability under which Northwood attempts to recover its attorneys' fees and costs. *Id.* at 58–59. Following a careful review of the principles articulated in former and Revised Article 9, we agree.

¶ 28 Revised § 9402 governs the question of whether a secured party is obligated on the contract of a debtor.

> *The existence of* a security interest, agricultural lien or *authority given to a debtor to dispose of or use collateral,* without more, *does not subject a secured party to liability in contract* or tort for the debtor's acts or omissions.

13 Pa.C.S.A. § 9402, **Secured party not obligated on contract of debtor or in tort** (emphasis added). UAB's argument is further bolstered by the Official Comment to Revised § 9402, which in pertinent part provides:

> 1. **Source.** Former Section 9317.
> 2. **Nonliability of Secured Party.** *This section,* like former Section 9317, *rejects theories on which a secured party might be held liable on a debtor's contracts* or in tort merely *because a security interest exists or because the debtor is entitled to dispose of or use collateral.* This section expands former Section 9317 to cover agricultural liens.

*Id.,* Official Comment (emphasis added).

¶ 29 Accordingly, we conclude the trial court erred as a matter of law in denying UAB's motion for summary judgment on a basis that would ultimately allow Northwood to recover attorney's fees and costs from the contested sale proceeds under a theory of liability that violates the principles of Revised Article 9.

¶ 30 Based on the foregoing analysis, we conclude: (1) Northwood is entitled to $14,951 of the sale proceeds on deposit at the Dauphin County Prothonotary, and (2) UAB is entitled to the balance of remaining proceeds, the USTA registration certificates reflecting ownership of the purchased horses and the Adams County horses.

¶ 31 Order reversed; case remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.